UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

MARK F. COLEMAN,

                       Plaintiff,

      v.

COMMISSSIONER OF SOCIAL SECURITY,

                       Defendant.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-6624 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Mark F. Coleman commenced the above-captioned action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for supplemental security income and social security disability insurance under the Social Security Act (the "SSA"). (Am. Compl., Docket Entry No. 8.)[1] The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that substantial evidence supports Administrative Law Judge Jay Cohen's (the "ALJ") decision that Plaintiff was not disabled. (Comm'r Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 13; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 14.) Plaintiff cross-moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the ALJ (1) failed to give controlling weight to Plaintiff's treating physicians, and (2) omitted the opinions of one of Plaintiff's treating physicians from Plaintiff's residual functional capacity

---

[1] Plaintiff filed his initial complaint *pro se*, but filed the Amended Complaint after retaining counsel. (*See* Compl., Docket Entry No. 1; Notice of Appearance by Howard D. Olinsky on behalf of Plaintiff; Docket Entry No. 7; Am. Compl.)

("RFC") assessment, which led to the ALJ's erroneous determination that Plaintiff could perform a job that existed in significant numbers in the economy. (Pl. Cross-Mot. for J. on the Pleadings ("Pl. Mot."), Docket Entry No. 16; Pl. Mem. of Law in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 17.) For the reasons discussed below, the Court grants Plaintiff's cross-motion for judgment on the pleadings, denies the Commissioner's motion for judgment on the pleadings and remands the case for further proceedings consistent with this Memorandum and Order.

## I. Background

Plaintiff is currently fifty-five years old. (Certified Admin. Record ("R.") 184, Docket Entry No. 12.) Plaintiff has a bachelor's degree in human services. (R. 63.) From August of 2004 to April of 2011, the Salvation Army employed Plaintiff as a maintenance worker, which employment entailed various janitorial duties. (R. 226, 253, 255, 261.) Plaintiff began suffering back and shoulder pain in 2008, after he was involved in a car accident. (R. 298.) In 2010, Plaintiff was diagnosed with prostate cancer and began receiving radiation treatment shortly thereafter. (R. 318–19, 321, 342–43, 390.) The prostate cancer went into remission in 2011 and remains in remission. (R. 68, 235–36, 320, 327, 340.) Plaintiff maintains that he was unable to continue working after April 15, 2011, due to his mental and physical ailments. (R. 221, 225.)

Plaintiff applied for supplemental security income and social security disability insurance on August 21, 2012, asserting that he was disabled based on degenerative disc disease of the spine, disc herniation, disc bulges, frank spinal stenosis, arthritis of the lower back and hips, prostate cancer, depression and alcoholism. (R. 221, 225.) On October 18, 2012, a disability adjudicator issued a report initially denying Plaintiff's application. (R. 99–111.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), which hearing occurred on November 14, 2013, before the ALJ. (R. 58–93, 135.) After the hearing, the ALJ found that

Plaintiff was not disabled between April 15, 2011 (the "alleged onset of disability"), and August 7, 2013, but was disabled as of August 8, 2013. (R. 20–38.) Plaintiff filed an appeal challenging the ALJ's decision that he was not disabled between April 15, 2011 and August 7, 2013 (the "Contested Period"). (R. 16.) The Appeals Council declined review, and Plaintiff filed a timely appeal with the Court. (R. 1–5; Compl., Docket Entry No. 1.)

### a. Hearing before the ALJ

On November 14, 2013, the ALJ held a hearing regarding Plaintiff's application for social security benefits. (R. 58–92.) The ALJ heard testimony from Plaintiff, Sharon Grand, M.D., and Andrew J. Pasternak, a vocational expert.[2] (R. 58–92.) Plaintiff appeared with counsel. (R. 58–92.)

#### i. Plaintiff's testimony

Plaintiff testified as follows. At the time of the hearing, he lived with his wife and granddaughter. (R. 63.) He was previously employed as a maintenance worker for the Salvation Army, where he performed various janitorial duties. (R. 64–65.) The heaviest items he lifted during his employment weighed between thirty-five and fifty pounds. (R. 65.) He was unable to work because he had "pain that . . . radiates down both [of his] legs," which pain stemmed from the pain in his back. (R. 66.) He was able to sit and stand for approximately forty-five minutes to an hour, depending on how well he slept the previous night. (R. 66.) He could walk for approximately two blocks and could lift up to ten pounds. (R. 66.) He previously suffered from prostate cancer, but it went into remission after he received radiation treatment and it remained in remission thereafter. (R. 67–68.) As a result of the radiation treatments, he had trouble with his

---

[2] The hearing transcript identified Pasternak as Pasnek. (*Compare* R. 59 *with* R. 172 (curriculum vitae of Andrew J. Pasternak).)

bladder and his bowels.  (R. 66.)  He had trouble sleeping at night due to pain and cramps in his legs and shoulders.  (R. 76.)  He used a cane to ambulate and had a cane with him at the hearing.  (R. 77.)  Although he was prescribed the cane in 2013, he had used it since 2012.  (R. 77.)  He had trouble climbing the stairs in his home, and as a result, he slept on the ground level of the home occasionally.  (R. 77–78.)  He also had trouble dealing with his family and strangers on public transportation.  (R. 78.)  He had problems concentrating and remembering dates and appointments.  (R. 79.)  He could read if he could stay focused.  (R. 79.)  He was receiving psychological treatment by Dr. Imran Shaikh, who had prescribed him Wellbutrin and Seroquel.  (R. 72–73.)

Plaintiff also explained his daily activities.  (R. 73.)  He went to the community center, where he would talk with children who attended the community center's after-school program.  (R. 73.)  Sometimes, after leaving the community center, he traveled to his granddaughter's school to check in on her.  (R. 73.)  Whenever possible, he would get a ride to alcoholics' anonymous meetings.  (R. 74.)  He had been sober since August of 2012.[3]  (R. 76.)  Occasionally, he cooked, but he did not clean, shop or drive.  (R. 74.)  For leisure, he watched movies at home and sometimes his friends would visit him at home on Fridays.  (R. 74.)  His family, however, never visited him.  (R. 75.)  He was able to use public transportation, but if he was unable to get a seat and had to stand, he would lose feeling in his legs and use the support bars to prevent himself from falling.  (R. 75.)

---

[3] Plaintiff's testimony regarding his date of sobriety is inconsistent.  During a visit with Dr. Imran Shaikh in June of 2013, Plaintiff reported that he had been sober since April of 2013, (R. 512), but at the hearing before the ALJ,  Plaintiff testified that he had been sober since August of 2012, (R. 76).

### ii. Dr. Grand's testimony

Based on a review of the evidence in Plaintiff's record, Dr. Grand gave an opinion as to Plaintiff's mental impairments. (R. 80–81, 84.) Dr. Grand testified that Plaintiff had a history of depressive disorder, not otherwise specified, and alcohol dependence, which was in remission. (R. 81.) Plaintiff's depressive symptoms "would impact his ability to cope with stress, so he would be limited to a low-stress job and also a job that is routine, not necessarily repetitive." (R. 82.) His time with coworkers, supervisors and the public would need to be limited to fifty-percent of his workday due to his mental impairments, and he would also need "some breaks" during the day. (R. 82.) Dr. Grand opined that nothing in the record indicated or supported a finding that Plaintiff likely would miss work more than three times per month. (R. 82–83.) She also opined that substance abuse was not a "material factor in the limitations" identified. (R. 83.) Dr. Grand concluded that Plaintiff's severe impairments failed to meet or equal a listing in Appendix 1 of the Social Security Regulations. (R. 83.)

### iii. Vocational expert testimony

After reviewing the evidence in Plaintiff's record, Mr. Pasternak, the vocational expert, testified as follows. (R. 84.) The ALJ asked Pasternak

> to consider a person of [Plaintiff's] age, education and work history, who was limited to the performance of light work with the following additional limitations: routine work . . . with the ability to be in contact with supervisors, coworkers and the public for [fifty] percent of the workday; no requirement to make job-related discretionary decisions or deal with potential conflict situations and not subject to rate quotas.

(R. 86.) Mr. Pasternak testified that such person could not perform Plaintiff's previous employment as a maintenance worker. (R. 86.) Mr. Pasternak testified that the described hypothetical person could, however, perform "light level" jobs as a "Hand Packager," "Assembler" and "Hotel/Motel Cleaner." (R. 87–88.) At the "medium" level, the described

hypothetical person could perform the job of a "Dishwasher," "Vehicle Cleaner" and "Parks Worker." (R. 88–89.) Plaintiff's counsel asked Pasternak to assume that the described hypothetical person "required the use of a cane for ambulation." (R. 89.) Pasternak testified that such a person could not perform the medium or light level jobs he mentioned previously. (R. 90.) The ALJ asked if such a person could perform "any jobs at the light level." (R. 91.) Pasternak testified that the person could perform light level jobs as a "Ticket Taker," "Sewing Machine Operator" and "Inspector." (R. 91–92.)

### b. Plaintiff's physical impairments

#### i. Dr. Choong Kwon Kim

In November of 2008, Plaintiff was involved in a motor vehicle accident. (R. 298.) After the accident, Plaintiff was suffering from neck, back and shoulder pain and sought treatment from Choong Kwon Kim, M.D. (R. 298.) Dr. Kim initially examined Plaintiff in December of 2008 and referred Plaintiff for a magnetic resonance imaging exam ("MRI") of his back. (R. 298.) The MRI was conducted in January of 2009 and revealed: scoliosis and straightening of the spine possibly due to spasms; multiple herniation in the central disc; disc bulges; and frank spinal stenosis. (R. 305.)

During a visit with Dr. Kim later that month, Plaintiff complained of moderate pain in his back that increased on flexion and extension and radiated to his lower extremities, as well as moderate and constant pain in his shoulder that increased when he elevated his arm. (R. 298–300.) Based on an MRI, Dr. Kim noted that Plaintiff had cervical spine disc bulges. (R. 298.) Dr. Kim made the following observations after examining Plaintiff: moderate tenderness over the lower cervical spine, with left upper trapezius muscle spasm; restricted range of motion of the cervical spine due to pain; positive Spurling sign; positive Soto-Hall sign test; as to the left shoulder there was moderate tenderness over the anterior and posterior aspect; and impingement

sign was positive.  (R. 299.)  Dr. Kim also examined Plaintiff's lumbar spine and found moderate

tenderness over the lumbosacral area, with paralumbar muscle spasms; flexion and extension of

the lumbar spine was painful and moderately restricted; straight leg raising test was positive

bilaterally at about seventy degrees; and Milgram sign was positive.  (R. 299.)  The remaining

tests produced negative results.  (R. 299.)  Dr. Kim opined that Plaintiff had cervical spine

interval derangement, lumbar spine internal derangement, symptoms of cervical radiculopathy

with radicular pain into the left shoulder, symptoms of lumbosacral radiculopathy with radicular

pain into both lower extremities, traumatic myofascitis dysfunction syndrome and left shoulder

pain.  (R. 300.)  Dr. Kim concluded that Plaintiff's ailments directly resulted from the motor

vehicle accident and that Plaintiff was "presently and partially disabled for his work for an

undetermined period as a result of his injuries."  (R. 300.)  Dr. Kim recommended that Plaintiff

continue physical therapy treatment.  (R. 300.)

### ii.  Dr. Viviane Etienne

In March of 2009, Plaintiff visited Viviane Etienne, M.D.  (R. 316.)  Plaintiff complained

of neck pain and lower back pain that radiated to his legs.  (R. 316.)  Dr. Etienne examined

Plaintiff's cervical spine and observed that Plaintiff's active and passive range of motion had

improved, but he had mild paracervical muscle spasms on rotation and that Plaintiff had bilateral

mild muscle spasticity.  (R. 316.)  On examination of Plaintiff's lumbar spine, Dr. Etienne

observed that Plaintiff had partial pain and restrictions in all directions, moderate lumbosacral

paraspinal muscle spasms, positive bilateral straight leg raise at thirty degrees, bilateral muscle

spasticity in the lumbar and gluteal/piriformis musculature and an improved active and passive

range of motion.  (R. 316.)  Dr. Etienne noted that an MRI of Plaintiff's lumbosacral spine

reflected two hernias, three bulges, spasms and stenosis.  (R. 317.)  Dr. Etienne diagnosed

Plaintiff with traumatic cervical paraspinal myofascitis with discogenic radiculopathy and

intersegmental dysarthria, traumatic lumbar paraspinal myofascitis with discogenic radiculopathy and extension of sciatic neuropathy. (R. 317.) Dr. Etienne issued rule-out[4] diagnoses as to cervical and lumbosacral radiculopathy. (R. 317.) Dr. Etienne recommended that Plaintiff continue active physical therapy two to three times per week, engage in home exercise with home-based physical therapy and that Plaintiff return for a follow-up examination in four weeks. (R. 317.)

The following month, Plaintiff returned to Dr. Etienne for a follow-up examination. (R. 313.) Plaintiff complained that he was suffering from weakness in both legs as well as neck and lower back pain, but reported that since his last visit the severity of the pain had reduced by seventy percent in both areas. (R. 313.) Dr. Etienne examined Plaintiff's cervical spine and observed improved active and passive range of motion with mild paracervical muscle spasms; mild muscle spasticity in the cervical musculature; and that range of motion was normal regarding flexion, extension, left rotation, right rotation, left lateral flexion and right lateral flexion as measured by an inclinometer. (R. 313.) Dr. Etienne's examination of Plaintiff's lumbar spine revealed improved active and passive range of motion in all directions with mild lumbosacral and bilateral quadriceps muscle spasms; bilateral muscle spasticity in the lumbar musculature; and normal range of motion for flexion, extension, left lateral flexion and right lateral flexion as measured by an inclinometer. (R. 313.) Dr. Etienne noted that Plaintiff's electromyography ("EMG") results were positive for C6 radiculopathy. (R. 314.) Dr. Etienne opined that Plaintiff had traumatic musculo-ligamentous sprain/strain of the neck, traumatic cervical paraspinal myofascitis with discogenic radiculopathy and intersegmental dysarthria,

---

[4] A "rule-out" diagnosis means that the physician is unable to make a medical determination based on the evidence currently available to him or her. *See Talavera v. Astrue*, 697 F.3d 145, 150 (2d Cir. 2012).

traumatic lumbar paraspinal myofascitis with discogenic radiculopathy, extension of sciatic neuropathy and lumbosacral joint ligament sprain.  (R. 314.)  Dr. Etienne issued rule-out diagnoses for cervical and lumbar radiculopathy.  (R. 314.)  Dr. Etienne recommended that Plaintiff continue active physical therapy one to two times per week, engage in home exercise with home-based physical therapy and perform stretch and strength exercises.  (R. 314.)  Dr. Etienne's prognosis was guarded.[5]  (R. 314.)

### iii.    Prostate cancer physicians

In 2010, Plaintiff was under the care of William Johnson, M.D., a primary care physician, and Carlton Branswell, M.D., a urologist, who referred Plaintiff for a biopsy of the prostate under suspicion that he may have prostate cancer.  (R. 318–19.)  Niti Dube, M.D., conducted the biopsy in September of 2010, analyzed the biopsy sample and concluded that Plaintiff had prostate cancer.  (R. 318–19.)  Dr. Nube informed Plaintiff that the cancer could be treated with surgery or targeted radiation treatments.  (R. 319.)  Plaintiff chose the latter.  (R. 319.)

Dr. Nube also conducted a full medical history evaluation of Plaintiff, which included a bone scan and a cervical spine x-ray.  (R. 318.)  The bone scan revealed an abnormality at the C6 vertebrae, and the cervical spine x-ray revealed degenerative disease.  (R. 318.)

Plaintiff's radiation treatments began in April of 2011 and ended in July of 2011. (R. 320.)  In August of 2011, Plaintiff had a post-radiation follow-up examination, which included a physical examination.  (R. 326.)  The physical examination notes stated, among other things, that Plaintiff did not have any tenderness in his neck, back, spine or ribs.  (R. 326.)  Plaintiff was instructed to attend future follow-up appointments with Dr. Branswell.  (R. 327.)

---

[5] "Guarded prognosis refers to a prognosis given by a physician [expressing that] the outcome of a patient's illness is in doubt."  Taber's Cylcopedic Medical Dictionary, 914 (21st ed. 2009).

Between March of 2011 and February of 2012, Plaintiff was examined by Dr. Branswell on five separate occasions, and as relevant here, Dr. Branswell noted that Plaintiff never complained of back pain. (R. 412, 436, 438, 447, 452.)

After concluding the targeted radiation treatment, Plaintiff's prostate cancer went into remission and currently remains in remission. (R. 68, 235–36, 320, 327, 340.)

### iv. Dr. Eduardo Fuzaylov

In July of 2012, Plaintiff saw Eduardo Fuzaylov, M.D., complaining of cramps and a decreased range of motion in his lower extremities, numbness and burning in his feet, difficulty walking, difficultly getting out of bed and lower back stiffness and pain, which all had progressed over the preceding months. (R. 556–57.) Dr. Fuzaylov observed that Plaintiff had back muscle cramps, back pain, a decreased range of motion in the lumbar spine due to muscle spasms and that Plaintiff was unable to lie flat on his back. (R. 556–57.) Dr. Fuzaylov noted that a 2010 MRI showed that Plaintiff had multilevel stenosis. (R. 557.) Dr. Fuzaylov recommended that Plaintiff undergo a lumbar spine MRI because his symptoms had progressed recently. (R. 557.)

Plaintiff saw Dr. Fuzaylov again in August of 2012, during which visit Plaintiff reported that his back felt better and that he had fewer muscle spasms. (R. 558.) Dr. Fuzaylov observed that Plaintiff's lumbar spine had fewer spasms and flexion was about sixty percent. (R. 558.) Dr. Fuzaylov noted that he would make further assessments of Plaintiff's back pain once he received the MRI results, but also prescribed a muscle relaxer for the pain. (R. 558.)

Plaintiff had two visits with Dr. Fuzaylov in September of 2012. (R. 263–64, 559.) During the first visit, Plaintiff complained of lower back pain that radiated to his lower extremities. (R. 263.) Dr. Fuzaylov examined Plaintiff and diagnosed Plaintiff with moderate to severe spinal stenosis, specifically, multilevel lower lumbar spondylosis with multilevel bilateral

neural foraminal narrowing. (R. 264.) Five days later, Dr. Fuzaylov met with Plaintiff again and again noted that Plaintiff had moderate to severe spinal stenosis. (R. 559.) Plaintiff reported that the muscle relaxers provided some pain relief, and Dr. Fuzaylov referred Plaintiff to a physical therapist for a pain management consultation.[6] (R. 559.)

Plaintiff returned to Dr. Fuzaylov in November of 2012, complaining of lower and middle back pain. (R. 561.) Dr. Fuzaylov planned an epidural injection for Plaintiff.[7] (R. 561.) Dr. Fuzaylov observed mild paraspinal muscle spasms and no change in the range of motion in Plaintiff's lumbar spine. (R. 561.) Dr. Fuzaylov recommended that Plaintiff take Tylenol or Motrin for pain management.[8] (R. 561.)

### v. Dr. Joyce Graber — Consultative Examination

After Plaintiff applied for social security benefits, Joyce Graber, M.D., examined Plaintiff to assess his physical limitations as they existed in October of 2012. (R. 359–62.) Plaintiff reported that he suffered from back pain since 2008, and at the time, assessed his pain as a ten on a scale of one to ten. (R. 359.) As to his activities of daily living, Plaintiff reported that he lives alone, cooks once or twice a week, shops for himself, dresses himself, bathes three times a week and does not clean, do laundry or shower. (R. 360.) Dr. Graber examined Plaintiff and observed

---

[6] Plaintiff saw physical therapist Xiaogaung Liu, M.D., in October of 2012. (R. 568.) Plaintiff reported back pain and weakness in his lower extremities and a pain level of six on a scale of one to ten. (R. 568.) Dr. Liu noted that Plaintiff did not use a wheelchair, walker, crutches or a cane. (R. 568.) Dr. Liu opined that Plaintiff was able to conduct his daily activities, live independently and move around without assistance. (R. 568.) Dr. Liu recommended that Plaintiff improve his range of motion, muscle strength and functioning. (R. 568.)

[7] The record does not reflect when, if ever, Plaintiff received the epidural injection.

[8] In August of 2013, Plaintiff began treatment with Jeffery Perry., D.O. (R. 481–86, 542–43, 547–53.) The Court does not recount Plaintiff's visits with Dr. Perry or Dr. Perry's opinions because they do not pertain to the Contested Period.

that Plaintiff had a normal gait, could walk on his heels and toes without difficulty, could fully

squat, had a normal stance, did not use any assistive devices, did not need any help traversing the

exam table and was able to rise from a chair without difficulty.  (R. 360.)  Dr. Graber also

observed that Plaintiff had full flexion, extension, lateral flexion and bilateral rotary movement

of the cervical and lumbar spine as well as the shoulders.  (R. 361.)  Dr. Graber diagnosed

Plaintiff with back pain by history and opined that "based upon today's examination[,] the

claimant has no physical limitations."  (R. 362.)

### c.   Plaintiff's mental impairments

#### i.   Dr. Imran Shaikh

In August of 2012, Plaintiff began treatment with psychiatrist Imran Shaikh, M.D.,

through a voluntary drug treatment program.  (R. 303.)  Plaintiff reported that he had been

drinking alcohol since he was fourteen years old and continued to drink a half-pint of alcohol at

night to help him sleep.  (R. 303.)  Plaintiff also reported that his bout with prostate cancer and

the effects of the radiation treatment caused depression, and, while he had had suicidal thoughts,

he never had any plans or intentions to commit suicide.  (R. 303.)  Plaintiff explained that his

depression was exacerbated after his thirty-nine-year-old brother committed suicide.  (R. 303.)

Dr. Shaikh observed that Plaintiff had a depressed mood with a sad and tearful affect, was mildly

anxious during the questioning, and had no suicidal thoughts, ideations or plans.  (R. 304.)

Dr. Shaikh diagnosed Plaintiff with alcohol dependence and found a global assessment of

functioning ("GAF") score of fifty.[9]  (R. 304.)  Dr. Shaikh issued rule-out diagnoses for

---

[9]  The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning).  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed.

depression due to prostate cancer, depression, not otherwise specified, and mood versus bipolar disorder, not otherwise specified. (R. 304.) Dr. Shaikh prescribed Wellbutrin for Plaintiff's mood and depression and Seroquel for mood stabilization and sleep aid. (R. 304.) Dr. Shaikh's prognosis was fair, contingent upon Plaintiff completing the treatment program. (R. 304.)

In September of 2012, Dr. Shaikh completed a disability questionnaire related to Plaintiff's application for social security benefits. (R. 329–37.) Dr. Shaikh noted that he diagnosed Plaintiff with alcohol dependence and issued rule-out diagnoses for depressive disorder and bipolar disorder, prognoses guarded. (R. 329–30.) Dr. Shaikh stated that Plaintiff was able to perform activities of daily living. (R. 333.) Dr. Shaikh explained that, in his opinion, Plaintiff had a depressed and irritable mood, was easily angered and feared death. (R. 333.) Dr. Shaikh opined that Plaintiff had no limitations regarding his understanding and memory. (R. 333.) Dr. Shaikh also opined that Plaintiff had limitations concerning his concentration and persistence, social interactions and adaptation due to his poor concentration, depressed mood, anger issues and low energy. (R. 334.) Dr. Shaikh attached to the questionnaire a copy of his report from Plaintiff's initial examination. (R. 336–37.)

Plaintiff had a follow-up examination with Dr. Shaikh in October of 2012. (R. 356.) Plaintiff reported that he failed to see Dr. Shaikh sooner because he did not have the finances to use public transportation or other access to transportation. (R. 356.) Plaintiff also reported that

---

2000) ("DSM-IV")). "A GAF in the range of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Zabala v. Astrue*, 595 F.3d 402, 406 n.2 (2d Cir. 2010) (alteration and internal quotation marks omitted) (citing DSM–IV, at 34). "A GAF between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kohler*, 546 F.3d at 262 n.1 (alteration and internal quotation marks omitted) (citing DSM-IV at 34).

the medication significantly improved his mood and his sleep, but he finished his medication before he could see Dr. Shaikh for the follow-up examination and his symptoms returned. (R. 356.) As a result, Plaintiff informed Dr. Shaikh that he returned to using alcohol to cope with his depression and trouble sleeping, which use he regretted. (R. 356.) Dr. Shaikh diagnosed Plaintiff with alcohol dependence, depressive disorder due to prostate cancer and mood disorder, not otherwise specified. (R. 357–58.) Dr. Shaikh also issued a rule-out diagnosis for bipolar disorder, and found a GAF score of fifty-one to sixty. (R. 358.) Dr. Shaikh recommended that Plaintiff continue taking Wellbutrin and Seroquel, renewed Plaintiff's prescriptions for those medications and recommended that Plaintiff avoid drinking alcohol and continue with the treatment program. (R. 358.)

Plaintiff had another follow-up visit with Dr. Shaikh in May of 2013. (R. 528.) Dr. Shaikh noted that Plaintiff was using a cane for ambulation and had recently relapsed on his alcohol use because he finished his medication and his insurance refused to cover the cost for a refill. (R. 528.) Dr. Shaikh diagnosed Plaintiff with alcohol dependence and bipolar disorder, not otherwise specified. (R. 528.) Dr. Shaikh recommended that Plaintiff continue taking the previously prescribed medications and return for a follow-up visit in June. (R. 528.)

In June of 2013, Plaintiff completed the drug treatment program and had an exit evaluation with Dr. Shaikh. (R. 512.) Plaintiff reported that he had been sober since April of 2013. (R. 512.) Dr. Shaikh observed that Plaintiff's mood was good, calm and cooperative, affect was appropriate and noted that Plaintiff had no suicidal thoughts or ideations. (R. 512.) Dr. Shaikh diagnosed Plaintiff with alcohol dependence in remission and bipolar disorder, not otherwise specified. (R. 512.) Dr. Shaikh recommended that Plaintiff continue taking the previously prescribed medications and renewed the prescriptions. (R. 512.) Dr. Shaikh noted

that Plaintiff had completed the program and would be transitioning to seeing an outside psychiatrist. (R. 512.) Thereafter, Plaintiff saw Dr. Shaikh on two occasions in October of 2013 for medication and prescription management. (R. 518–19, 521–22.) Dr. Shaikh's report of those visits largely mirrored his report of the June 2013 visit. (R. 518–19, 521–22.)

In October of 2013, Dr. Shaikh completed a psychiatric/psychological impairment questionnaire related to Plaintiff's application for social security benefits. (R. 534.) Dr. Shaikh noted that he had diagnosed Plaintiff with alcohol dependence and major depressive disorder, prognoses guarded. (R. 534.) Dr. Shaikh also noted that Plaintiff's most recent GAF score was fifty-five to sixty. (R. 534.)

The questionnaire asked for Dr. Shaikh's opinions concerning Plaintiff's mental abilities related to understanding and memory, concentration and persistence, social interactions and adaptation. (R. 537–39.) For six out of the twenty categories regarding Plaintiff's mental abilities, Dr. Shaikh opined that Plaintiff was "mildly limited,"[10] and for another six categories, Dr. Shaikh opined that Plaintiff was "moderately limited." (R. 537–39.) Dr. Shaikh also opined that Plaintiff's impairments would last at least twelve months and that Plaintiff was only capable of tolerating low-stress work environments. (R. 540.) Dr. Shaikh noted that Plaintiff's impairments likely would produce "good days and bad days" and likely would cause Plaintiff to miss work more than three times per month. (R. 540–41.) Dr. Shaikh stated that his opinions, findings and conclusions applied currently and dated back to when he first examined Plaintiff in August of 2012. (R. 541.)

---

[10] The questionnaire defined "mildly limited" as a limitation that "does not significantly affect the individual's ability to perform the activity," and defined "moderately limited" as a limitation that "significantly affects but does not totally preclude the individual's ability to perform the activity." (R. 536.)

### ii.    Dr. Toula Georgiou – Consultative Examination

After Plaintiff applied for social security benefits, Toula Georgiou, Psy. D., examined Plaintiff to assess his psychological limitations as they existed in October of 2012.  (R. 349–52.) Plaintiff reported difficulty sleeping, decreased appetite, and depressive symptoms, which symptoms included dysphoric mood, crying spells, loss of interest, loss of pleasure, fatigue, irritability, social withdrawal and thoughts of suicide with no plans or intentions to commit suicide or otherwise hurt himself.  (R. 349, 351.)  Plaintiff was receiving psychiatric treatment for his symptoms.  (R. 349)  Plaintiff also reported that he was drinking a half-pint of alcohol four to five times per week, did not get along well with his family, had a dog and spent his time volunteering at a community garden, watching television or attending treatment programs. (R. 349, 351.)  Dr. Georgiou observed that Plaintiff was cooperative, with an adequate manner of relating, walked with a cane, had coherent and goal directed thought processes and had a dysphoric affect, dysthymic mood and clear sensorium.  (R. 350.)  Dr. Georgiou also observed that Plaintiff's attention and concentration was intact, recent and remote memory skills were mildly impaired, cognitive function was average and insight and judgment were fair.  (R. 350– 51.)

As to Plaintiff's activities of daily living, Dr. Georgiou noted that Plaintiff was able to dress, bathe, groom, manage his own money, use public transportation and prepare simple meals, but was unable to clean, do laundry or shop.  (R. 351.)  Dr. Georgiou opined that Plaintiff was "able to follow and understand simple directions and instructions, perform simple tasks independently, and attend and concentrate on tasks.  He may have difficulties having to relate with others, deal with stress and maintain a regular schedule at this time."  (R. 351.) Dr. Georgiou concluded that her findings were consistent with Plaintiff's history of psychiatric difficulties, which difficulties "may significantly interfere with [his] ability to function on a daily

basis." (R. 351.) Dr. Georgiou diagnosed Plaintiff with alcohol abuse and depressive disorder, not otherwise specified. (R. 351.) Dr. Georgiou's prognosis was fair, and she recommended that Plaintiff continue his then-current treatment. (R. 352.)

### d. The ALJ's decision

Prior to issuing his decision, the ALJ contacted Plaintiff's counsel and asked if he would amend the alleged onset of disability date from April 15, 2011 to May 8, 2013, which amendment would result in Plaintiff receiving a fully favorable decision. (R. 289.) Plaintiff, through counsel, declined. (R. 289–91.)

The ALJ issued his decision on May 27, 2013, finding that Plaintiff was not disabled during the Contested Period, but was disabled as of August 8, 2013.[11] (R. 20–38.) The ALJ applied the five-step analysis for determining whether an individual is disabled and may receive social security benefits. (R. 20–38.) At step one, the ALJ found that Plaintiff was not working and had not engaged in substantial gainful employment since the alleged onset of disability date. (R. 24.) At step two, the ALJ found that Plaintiff had a non-severe impairment of prostate cancer in remission and the following severe impairments: lumbar disc bulge and herniation; cervical spine degenerative disc disease; depressive disorder, not otherwise specified; and alcohol dependence in remission. (R. 24.) At step three, the ALJ found that the impairments, singly or combined, failed to meet or equal the severity of an impairment listed in Appendix 1 of the Social Security Regulations. (R. 24.) At step four, the ALJ found that Plaintiff could not perform his previous employment. (R. 35.) He also found that, as to Plaintiff's RFC, he could:

---

[11] Because neither party challenges the ALJ's decision that Plaintiff was disabled and entitled to social security benefits as of August 8, 2013, the Court focuses on the ALJ's decision as it pertains to the Contested Period. (*See* Comm'r Mem.; Pl. Mem.)

> perform light work . . . except that [he] was limited to routine work with contact with supervisor[s], coworkers and the public[,] limited to no more than [fifty] percent of the workday, no requirement to make job-related discretionary decisions or deal with potential conflict situations, and no requirement to be subject to production rate quotas.

(R. 25, 35.)  In making the step-four RFC determination for the Contested Period, the ALJ recounted much of the evidence and then assigned the following weights to the medical opinions: "great weight" to non-examining physician Dr. Grand; "significant weight" to consultative examiners Dr. Graber and Dr. Georgiou; "significant weight" to Dr. Shaikh; and "no controlling weight" to Dr. Kim.[12]  (R. 25–32.)  The ALJ also gave "little probative" weight to Plaintiff's testimony.  (R. 32.)  At step five, the ALJ found that, based on Plaintiff's RFC, Plaintiff could perform a significant number of jobs that existed in the national economy as testified to by vocational expert Mr. Pasternak.  (R. 35–37.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre*

---

[12]  Because Plaintiff began seeing Dr. Perry on August 8, 2013, the ALJ did not consider Dr. Perry's opinions in making his findings as to whether Plaintiff was disabled during the Contested Period.  (R. 32–35.)

*v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

   **b.  Availability of benefits**

   Supplemental security income is available to individuals who are "disabled" within the meaning of the SSA.[13] Federal disability insurance benefits are also available to individuals who are "disabled" within the meaning of the SSA. To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by

---

[13] Supplemental security income is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. The only issue before the Court is whether Plaintiff is disabled.

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff argues that the ALJ erred because: (1) the ALJ failed to give controlling weight to Plaintiff's treating physicians, and (2) the ALJ omitted the opinions of one of Plaintiff's treating physicians, Dr. Shaikh, from Plaintiff's RFC assessment, which led to the ALJ's erroneous determination that Plaintiff could perform a job that existed in significant numbers in the national economy. (Pl. Mem. 15–25.) The Commissioner argues that the ALJ's decision not to give controlling weight to Plaintiff's treating physicians was supported by substantial evidence because: (1) there was conflicting evidence in the record regarding Plaintiff's physical limitations, which conflict the ALJ was entitled to resolve, and (2) the medical opinions rejected by the ALJ lacked support in the record. (Comm'r Mem. 25–33.) For the reasons explained below, the Court finds that the ALJ violated the treating physician rule by failing to give controlling weight to Dr. Fuzaylov, one of Plaintiff's treating physicians, and by omitting Dr. Shaikh's opinion from Plaintiff's RFC assessment.

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[14] 20 C.F.R. § 404.1527(c)(2); *see*

---

[14] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the

*Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d

---

claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

On the other hand, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)).

### i. The ALJ erred by failing to consider and assign any weight to one of Plaintiff's treating physicians.

Remand is appropriate here because the ALJ violated the treating physician rule by failing to consider and assign any weight to the opinions of Dr. Fuzaylov, one of Plaintiff's treating physicians.

According to the evidence in the record, Dr. Fuzaylov treated Plaintiff for his back pain between July and November of 2012. (R. 263–64, 556–59, 561.) Dr. Fuzaylov examined Plaintiff on five separate occasions and made observations regarding Plaintiff's physical limitations, issued and monitored Plaintiff's prescription medications, ordered and analyzed an MRI of Plaintiff's back and pelvis and recommended that Plaintiff see a physical therapist. (R. 263–64, 556–59, 561.) Accordingly, Dr. Fuzaylov was a treating physician. *See Brickhouse*

*v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (noting that a "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]" (quoting 20 C.F.R. § 404.1502)). Dr. Fuzaylov's opinions are relevant as they were rendered during the Contested Period. (*See* R. 25, 263–64, 556–59, 561.) Nevertheless, in both recounting the evidence and assigning weight to the various physicians who rendered medical opinions, the ALJ only mentioned Dr. Fuzaylov once and did not assign any weight to his opinions. (R. 25–32.) The ALJ's failure to consider and assign any weight to Dr. Fuzaylov's opinions is a basis for remanding this case to the ALJ. *See Lesterhuis*, 805 F.3d at 89 (remanding a case to an ALJ because "[n]either the ALJ nor the Appeals Council analyzed the substance of [an] opinion" by one of the plaintiff's treating physicians); *Burgess*, 537 F.3d at 132 (remanding a case to an ALJ because "the reports of [one of the plaintiff's treating physicians] . . . w[ere] not expressly mentioned by the ALJ"); *Smith v. Astrue*, No. 10-CV-6018, 2013 WL 1681146, at *6 (E.D.N.Y. Apr. 17, 2013) (remanding to an ALJ because "the ALJ refers to [one treating physician] only once in his ten-page decision . . . [and] fails to mention [a second treating physician] at all"); *Colon v. Astrue*, No. 10-CV-3779, 2011 WL 3511060, at *12 (E.D.N.Y. Aug. 10, 2011) (finding that because "the ALJ failed to give . . . any consideration to the opinion of" the plaintiff's treating physician, "the ALJ committed legal error in his decision and . . . remand is appropriate").

### ii. The ALJ erred by omitting Dr. Shaikh's opinion from Plaintiff's RFC assessment

The ALJ also erred in his determination of Plaintiff's RFC because, while he assigned significant weight to Dr. Shaikh's opinions, Plaintiff's RFC assessment did not include Dr. Shaikh's opinion that Plaintiff likely would miss three or more days of work per month.

In recounting the evidence, the ALJ noted that Dr. Shaikh was a treating physician who opined that Plaintiff likely would "be absent from work as a result of impairments or treatment more than three times per month," (R. 29, 32). The ALJ accorded "significant weight" to Dr. Shaikh's opinions, (R. 32), but did not mention Dr. Shaikh's opinion regarding Plaintiff's likely monthly absences in assessing Plaintiff's RFC, (*see* R. 25). Nor did the ALJ mention this information at the hearing when he posed the RFC hypothetical to the vocational expert. (*See* R. 86–92). Therefore, because the ALJ accorded significant weight to Dr. Shaikh's opinion but failed to include Dr. Shaik's opinion regarding Plaintiff's likely absences from work in the RFC determination, the RFC assessment was flawed and requires remand. *See Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (holding that remand was required because "we need some explanation of why there was no discussion in the ALJ's decision of [the] opinion that [plaintiff] would have to miss more than four days per month"); *see also Foxman v. Barnhart*, 157 F. App'x 344, 347 (2d Cir. 2005) (holding that remand to an ALJ was proper because the ALJ's findings could "not be reconciled" with his findings regarding the medical opinion evidence).

In addition, courts in this Circuit have held that an opinion stating that a social security claimant likely may miss work multiple times per month is probative as to whether the claimant is disabled under the Social Security Regulations. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d. Cir. 2015) (holding that because the plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless"); *Lesterhuis*, 805 F.3d at 88 (remanding a case to an ALJ because "nothing in the record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be

absent from work"); *Rugless*, 548 F. App'x at 700 (remanding for the ALJ to consider an opinion by one of the plaintiff's treating physicians, which opinion stated that the plaintiff likely would miss more than four days per month).

The Commissioner argues that the ALJ did not consider Dr. Shaikh's opinion regarding Plaintiff's likely absences because it was not supported by any evidence in the record. (Comm'r Mem. 29.) The ALJ, however, expressed no such reasoning in his decision, and the Court will not address the Commissioner's *post hoc* arguments defending the ALJ's error. *See Lesterhuis*, 805 F.3d at 89 (holding that courts "may not affirm an administrative action on grounds different from those considered by the agency" (internal quotation marks omitted) (citing *Burgess*, 537 F.3d at 131)); *McAllister v. Colvin*, --- F. Supp. 3d ---, ---, 2016 WL 4717988, at *17 (E.D.N.Y. Sept. 9, 2016) ("Such *post hoc* rationalizations are insufficient, as a matter of law, to bolster the ALJ's decision."); *Demera v. Astrue*, No. 12-CV-432, 2013 WL 391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) ("The ALJ did not provide these explanations, however, and *post hoc* rationalizations for the ALJ's decision are not entitled to any weight." (citing *Snell*, 177 F.3d at 134)). Accordingly, the Court remands for the ALJ to consider Plaintiff's likely absences in making the RFC determination.[15]

---

[15] Because the Court finds that remand is proper on the bases that the ALJ erred in failing to consider Dr. Fuzaylov's opinions and in failing to consider Dr. Shaikh's opinion regarding Plaintiff's likely absences in assessing Plaintiff's RFC, the Court does not address Plaintiff's argument that the ALJ erred in determining that Plaintiff could perform a job that existed in significant numbers in the national economy, (Pl. Mem. 22–25). *See Foxman v. Barnhart*, 157 F. App'x 344, 347–48 (2d Cir. 2005) (declining to address arguments presented by the parties that were different from the bases underlying the Court's decision to remand).

**III. Conclusion**

For the foregoing reasons, the Court grants Plaintiff's cross-motion for judgment on the pleadings and denies the Commissioner's motion for judgment on the pleadings. The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.


SO ORDERED:


_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge


Dated: March 27, 2017
       Brooklyn, New York